UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

JOSEPH PARIANTE,

                             Plaintiff,

           -v-

THE CITY OF NEW YORK, New York City Police
Department Sergeant EDWARD VARGAS (Shield No.
1121), New York City Police Department Detective
RICARDO BOCACHICA (Shield No. 919), in their
individual capacities,

                        Defendants.

-------------------------------------------------------------------x

**SECOND AMENDED COMPLAINT AND DEMAND FOR A JURY TRIAL**


**<u>12-CV-4686 (GBD) (RLE)</u>**

      Plaintiff Joseph Pariante, through his attorney Robert M. Quackenbush of Rankin &

Taylor, PLLC, as and for his second amended complaint, does hereby state and allege:

<u>**PRELIMINARY STATEMENT**</u>

1.  This is a civil rights action brought to vindicate plaintiff's rights under the Fourth, Fifth and

    Fourteenth Amendments of the Constitution of the United States, through the Civil Rights

    Act of 1871, *as amended*, codified as 42 U.S.C. § 1983, and pendant claims through the

    Constitution and laws of the State of New York.

2.  Plaintiff Joseph Pariante's rights were violated when officers of the New York City Police

    Department ("NYPD") unconstitutionally and without any legal basis arrested him and

    caused him to prosecuted.  By reason of defendants' actions, including their unreasonable

    and unlawful searches and seizures, Mr. Pariante was deprived of his constitutional rights.

3.  Specifically, two Bronx NYPD narcotics officers approached Mr. Pariante and conducted an

    illegal search inside a corner store. The resulting search resulted in the police finding two

plain white, unmarked pills of Tramadol, a mild painkiller for which Mr. Pariante had a prescription.

4. Upon inquiry by the officers, Mr. Pariante informed them the pills were Tramadol, which were painkillers prescribed to him by his doctor. Mr. Pariante further informed them Tramadol is not a controlled substance.

5. The officers appeared to research the issue by doing an internet search about Tramadol on their web-enabled phones.

6. Any reasonable officer would know that Tramadol is not a controlled substance within the meaning of the New York Penal Law, the New York Public Health Law, or any other law.

7. Nevertheless, the officers arrested Mr. Pariante and had him charged with criminal possession of a controlled substance in the seventh degree.

8. On the face of the criminal court complaint, defendant Sgt. Vargas swore he recovered two pills of Tramadol, a substance he incompetently believed to be a controlled substance.

9. At arraignment, though, the criminal court judge instantly recognized that Tramadol was not a controlled substance under New York law. After a short amount of independent research at the bench, the judge confirmed Tramadol is not a controlled substance under either the Penal Law or the Public Health Law. The court then dismissed the charge against Mr. Pariante, and he was released from custody.

10. Mr. Pariante seeks an award of compensatory and punitive damages and attorneys' fees.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§ 1331, 1343 (3-4). This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States.

12. Pursuant to New York General Municipal Law § 50-E, Mr. Pariante filed a timely Notice of Claim with the New York City Comptroller on or about May 29, 2012, within 90 days of the events herein complained of. Thus, this Court has supplemental jurisdiction over Mr. Pariante's claims against defendants under the Constitution and laws of the State of New York because they are so related to the within federal claims that they form part of the same case or controversy pursuant to 28 U.S.C. § 1367(a).

13. None of Mr. Pariante's claims have been adjusted by the New York City Comptroller's Office.

14. Venue is proper pursuant to 28 U.S.C. § 1391(a)(2) in that Mr. Pariante's claim arose in the Southern District of New York.

15. An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

## PARTIES

16. Plaintiff Joseph Pariante is, and was at all times relevant to this action, a resident of the County of Kings in the State of New York.

17. Defendant The City of New York ("City") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant City assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by the NYPD.

18. NYPD Sergeant Edward Vargas (Shield No. 1121) and NYPD Detective Ricardo Bocachica (Shield No. 919) (collectively referred to as the "officer-defendants") are and were at all times relevant herein, officers, employees and agents of the NYPD.

19. The officer-defendants are being sued in their individual capacities.

20. At all times relevant herein, the officer-defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of the NYPD, and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties. They were acting for and on behalf of the NYPD at all times relevant herein, with the power and authority vested in them as officers, agents and employees of the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the NYPD.

21. The officer-defendants' acts hereafter complained of were carried out intentionally, recklessly, with malice, and in gross disregard of Mr. Pariante's rights.

22. At all relevant times, the officer-defendants were engaged in a joint venture, assisting each other in performing the various actions described herein and lending their physical presence and support and the authority of their offices to one another.

## STATEMENT OF FACTS

23. The events described herein occurred primarily within a store located near the southwest corner of East 187th Street and Third Avenue in the County of Bronx on May 19, 2012 at approximately 10:00 a.m. and thereafter.

24. At the time and place mentioned above, Mr. Pariante entered a corner store in order to buy a snack while he waited for his laundry to finish at a nearby laundromat.

25. While he was looking for a snack, two men in plainclothes – the officer-defendants – entered the store. Without announcing they were police officers, they approached Mr. Pariante from behind and started to frisk him and search in his pockets.

26. While searching in his pockets, one of the officer-defendants found two plain white, unmarked pills.

27. The officer-defendants asked Mr. Pariante what the pills were, and he truthfully informed them the pills were Tramadol, a mild painkiller which his doctor had prescribed to him. Mr. Pariante further informed that Tramadol is not a controlled substance.

28. Based upon their plain appearance, which was indistinguishable in appearance from many over-the-counter medications, no reasonably competent officer could believe there was probable cause to believe the pills were a controlled substance.

29. In response, the officer-defendants appeared to be doing research about Tramadol on their web-enabled cell phones. After allegedly completing that research, the officer-defendants unbelievably stated they thought Tramadol was a controlled substance.

30. The officer-defendants then rear-cuffed Mr. Pariante and drove him around in an unmarked police vehicle for approximately three and one-half hours. He was later transported to a police precinct.

31. Pursuant to NYPD policy, Mr. Pariante was deprived of access to his other regularly-prescribed medications inside the precinct, causing unnecessary discomfort and distress.

32. At some point, Mr. Pariante was transferred to Central Booking, where he stayed overnight.

33. Slightly before noon on May 20, 2012, Mr. Pariante was brought before the criminal court. On docket 2012BX029570, Mr. Pariante was charged with criminal possession of a controlled substance in the seventh degree, Penal Law § 220.03.

34. The charges were based upon the allegations of defendant Sgt. Vargas, which were knowingly false in several respects. Specifically, the criminal court complaint alleged as follows (with capitalizations in the original):

Deponent states, upon information and belief, the source of which is the supporting deposition being filed with this instrument by SGT EDWARD VARGAS Shield# 1121 of the NBBX that at the above time and place informant observed the defendant to have on his person, IN HIS RIGHT CHANGE POCKET IN PUBLIC VIEW TWO (2) WHITE (*sic*) containing TRAMADOL, WAS RECOVERED FROM DEFENDANT (*sic*) RIGHT CHANGE POCKET.

Informant believes the aforementioned substance(s) to be as indicated above based on informant's training and experience, which includes training in the recognition of CONTROLLED SUBSTANCES and MARIJUANA (a dried green leafy substance with a distinctive odor) as well as their packaging and PRESCRIBED CONTROLLED SUBSTANCES based on the label of the container.

Further, the defendant stated, in substance THAT'S FOR PAIN.

35. The criminal court judge immediately suspected that Tramadol was not a controlled substance. After some brief research at the bench, the judge confirmed that Tramadol was not a controlled substance within the meaning of New York law.

36. The court then dismissed the charge against Mr. Pariante, and he was released from custody.

37. Due to the defendants' conduct, Mr. Pariante was wrongfully in custody for approximately 26 hours.

38. The United States Supreme Court has recognized that police officers are presumed to know the law. *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982). For that reason, the defense of qualified immunity is not applicable to officers who are incompetent or those that knowingly violate the law. *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

39. New York law could not be clearer: To be a "controlled substance," it must be specifically listed in New York Public Health Law § 3306. *See* New York Penal Law § 220.00(5) (defining "controlled substance").

40. Tramadol is not listed in Public Health Law § 3306.

41. Here, the officer-defendants *either* incompetently believed Tramadol was a "controlled substance" under New York law *or* knowingly violated the law by arresting Mr. Pariante for possession a medicine they knew was not a controlled substance.

**FIRST CLAIM**
**DEPRIVATION OF RIGHTS**
**UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983**

42. Mr. Pariante incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

43. Defendants Sgt. Vargas and Det. Bocachica, under color of state law, subjected Mr. Pariante to the foregoing acts and omissions, thereby depriving Mr. Pariante of his rights, privileges and immunities secured by the Fourth, Fifth and Fourteenth Amendments to the United States Constitution, including, without limitation, deprivation of the following constitutional rights: (a) freedom from unreasonable seizure of his person; (b) freedom from arrest without probable cause; (c) freedom from false imprisonment, meaning wrongful detention without good faith, reasonable suspicion or legal justification, and of which Mr. Pariante was aware and did not consent; (d) freedom from the lodging of false charges against him by police officers; (e) freedom from malicious prosecution by police, that being prosecution without probable cause that is instituted with malice and that ultimately terminated in Mr. Pariante's favor; and (f) freedom from abuse of process.

44. Defendants' deprivation of Mr. Pariante's constitutional rights resulted in the injuries and damages set forth above.

**SECOND CLAIM**
**_MONELL_ CLAIM AGAINST DEFENDANT CITY – 42 U.S.C. § 1983**

45. Mr. Pariante incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

46. All of the acts and omissions by the officer-defendants described above were carried out pursuant to overlapping policies and practices of the City which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of defendant City and its agency, the NYPD.

47. Defendant City and the NYPD, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the officer-defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

48. The acts complained of were carried out by the aforementioned officer-defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the City and the NYPD, all under the supervision of ranking officers of the NYPD.

49. The aforementioned customs, practices, procedures and rules of the City and the NYPD include, but are not limited to, the following unconstitutional practices:

   a. Arresting persons known to be innocent in order to meet "productivity goals" (i.e., arrest quotas);

   b. Failing to supervise, train, instruct and discipline police officers and encouraging their misconduct, particularly in regards to the training, supervision and discipline of narcotics officers with regard to the identification of controlled substances;

   c. Discouraging police officers from reporting the corrupt or unlawful acts of other police officers; and

   d. Retaliating against officers who report police misconduct.

50. The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented in the following civil rights actions filed against the City and analogous prosecutions of police officers:

   a. People v. Arbeedy, 06314-2008 (Sup. Ct., Kings Co.) (NYPD narcotics detective found guilty of planting drugs on two innocent civilians; former undercover NYPD narcotics officer, Steve Anderson, testifies that fellow narcotics officers routinely

maintained a stash of narcotics to plant on innocent civilians in order to help those officers meet their arrest quotas; Mr. Anderson testified concerning the NYPD's practice of "attaching bodies" to the narcotics to make baseless arrests, stating: "It was something I was seeing a lot of, whether it was from supervisors or undercovers and even investigators. Seeing it so much, it's almost like you have no emotion with it. The mentality was that they attach the bodies to it, they're going to be out of jail tomorrow anyway, nothing is going to happen to them anyway. That kind of came on to me and I accepted it — being around that so long, and being an undercover"; the presiding judge, Justice Reichbach, stated: "Having been a judge for 20 years, I thought I was not naïve regarding the realities of narcotics enforcement. But even the court was shocked, not only by the seeming pervasive scope of the misconduct, but even more distressingly by the seeming casualness by which such conduct is employed");

b. <u>Schoolcraft v. City of New York</u>, 10-CV-6005 (RWS) (S.D.N.Y.) (police officer who exposed a precinct's policies and practices of illegal quotas for the issuance of summonses and arrests, falsifying evidence and suborning perjury alleges he was arrested and committed to a psychiatric facility in retaliation for exposing said policies and practices to the press);

c. <u>Colon v. City of New York</u>, 09-CV-0008 (E.D.N.Y.)   In an Order dated November 25, 2009, which denied the City's motion to dismiss on <u>Iqbal</u>/<u>Twombly</u> grounds, wherein the police officers at issue were fired and prosecuted for falsifying evidence in a purported buy-and-bust operation, the Honorable District Court Judge Weinstein wrote:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officer of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration – through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department – there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

d. <u>Bryant v. City of New York</u>, 22011/2007 (Sup. Ct., Kings Co.) (jury declares that NYPD officers acted pursuant to a City policy regarding the number of arrests officers were expected to make that violated plaintiff's constitutional rights and contributed to her arrest);[1]

---

[1]    For a description of this case and ultimate settlement, see, Oren Yaniv, *Court rules that cops do use quotas, woman injured in 2006 arrest settles for $75,000*, N.Y. Daily News, Feb. 19, 2011, *available at* http://www.nydailynews.com/news/ny_crime/2011/02/19/2011-02-19_court_rules_that_cops_do_use_ quotas_woman_injured_in_2006_arrest_settles_for_750.html.

e. <u>Williams v. City of New York</u>, 06-CV-6601 (NGG), 2009 U.S. Dist. LEXIS 94418 (E.D.N.Y.) (officers arrest plaintiff during a "vertical patrol" of a public housing project despite evidence that he had a legitimate reason to be on the premises);

f. <u>McMillan v. City of New York</u>, 04-CV-3990 (FB) (RML) (E.D.N.Y.) (officers fabricated evidence and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

g. <u>Avent v. City of New York</u>, 04-CV-2451 (CBA) (CLP) (E.D.N.Y.) (same);

h. <u>Smith v. City of New York</u>, 04-CV-1045 (RRM) (JMA) (E.D.N.Y.) (same);

i. <u>Dotson v. City of New York</u>, 03-CV-2136 (RMB) (S.D.N.Y.) (officers arrest and use excessive force against a candidate for City Council for trespassing in his own residential building);

j. <u>Richardson v. City of New York</u>, 02-CV-3651 (JG) (CLP) (E.D.N.Y.) (officers fabricated evidence, including knowingly false sworn complaints, and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

k. <u>Taylor v. City of New York</u>, 01-CV-5750 (ILG) (MDG) (E.D.N.Y.) (same as <u>Richardson</u>, except without the excessive force; judge at the criminal trial acquitting Mr. Taylor noted, on the record, that he had "significant doubt" about the truthfulness of the officers who testified);

l. <u>White-Ruiz v. City of New York</u>, 93-CV-7233 (DLC) (MHD), 983 F.Supp. 365, 380 (S.D.N.Y. 1997) (holding that the NYPD had an "unwritten policy or practice of encouraging or at least tolerating a pattern of harassment directed at officers who exposed instances of police corruption");

51. Furthermore, the existence of the aforesaid unconstitutional customs and policies, ***specifically with regard to "quotas" or so-called "productivity goals,"*** may be further inferred from the following:

a. Deputy Commissioner Paul J. Browne has repeatedly admitted that NYPD commanders are permitted to set "productivity goals."[2]

---

[2] Jim Hoffer, *NYPD Officer claims pressure to make arrests*, WABC-TV Eyewitness News, March 2, 2010, *available at* http://abclocal.go.com/wabc/story?section=news/investigators&id=7305356 ("Police Officers like others who receive compensation are provided productivity goals and they are expected to work").

b. An NYPD transit lieutenant was captured on tape telling officers to make more arrests to meet a captain's order and do more work if they want overtime assignments. "All they care about is ... summonses and arrests and 250s," Lt. Janice Williams said, using police jargon for the NYPD Stop, Question and Frisk reports. She added, "The bottom line is everybody's individual activity is being looked at." Later in the recording - made during a roll call in 2010 at Transit District 34 in Coney Island - she said only officers with "good productivity" will get the opportunity to work overtime. She also said Capt. James Sheerin wanted every officer to make at least one arrest per month - up from the previous order of one every three months - because crime had spiked and arrest totals were lower than other transit districts. "He wants everyone to get in the mindset that there's no more collar a quarter," Williams said.[3]

c. NYPD Officer Adil Polanco has asserted that his command, the 41st Precinct, regularly requires officer to make at least "one arrest and twenty summonses" per month. P.O. Polanco's allegations were confirmed by an audiotape obtained by the media. The contents of the tape reveal that these quotas are enforced through coercion and threats of job loss, to wit, a patrol supervisor at the 41st Precinct is overheard saying: "If you think one and 20 is breaking your balls, guess what you'll be doing. You're gong (sic) to be doing a lot more, a lot more than what they're saying." The tape also reveals that another patrol supervisor chimed in and told the officers: "Next week, 25 and one, 35 and one, and until you decide to quit this job and go to work at a Pizza Hut, this is what you're going to be doing till (sic) then."[4]

d. The New York Daily News obtained and published two (2) internal memos which were posted inside the roll-call room at the NYPD's 77th Precinct. The memos specifically instructed officers about "number of tickets to give drivers for cell phone, seat belt, double-parking, bus stop, tinted windows and truck route violations" they were expected to issue. The memos remained posted for several weeks inside the roll-call room until the media began inquiring.[5]

e. Responding to a query from a civilian who was cited on consecutive days in November of 2009 for allegedly occupying more than one seat on the New York City subway, the officer responded: "Recently we've been told to write tickets instead of

---

[3]    Rocco Parascandola, *NYPD Lt. Janice Williams captured on tape pushing for more busts, but brass says there's no quotas*, N.Y. Daily News, March 3, 2011, *available at* http://www.nydailynews.com/ny_local/2011/03/03/2011-03-03_nypd_lt_janice_williams_captured_on_tape_pushing_for_more_busts.html.

[4]    *Id.*

[5]    James Fanelli, Cops at Brooklyn's crime-ridden 77th Precinct told to meet quotas for moving violations, memos say, N.Y. Daily News, Nov. 8, 2010, *available at* http://www.nydailynews.com/ny_local/2010/11/08/2010-11-08_cops_told_to_meet_quotas.html.

give warnings for this type of thing." The officer explained that they needed to meet quotas.[6]

    f.    In December of 2010 and in response to the pressure from their supervisors to write baseless summonses pursuant to the policy and practice of "quotas," police officers at the 79th Precinct considered organizing a so-called "daylong summons boycott." As one (1) officer at the precinct explained, "Nobody feels this is right, asking us to write summonses just to meet a quota."[7]

    g.    In response to the planned summons-boycott at the 79th Precinct, on December 13, 2010, Deputy Chief Michael Marino marched into the precinct at roll call with a deputy inspector and read officers the riot act. "Just try it," a police source quoted Marino as saying. "I'll come down here and make sure you write them." Marino also vowed to transfer people, like he did when he was the commanding officer of the 75th Precinct in East New York.[8]

    h.    Capt. Alex Perez, the second in command at the NYPD's 81st Precinct, testified in a civil matter before a Brooklyn Supreme Court jury that officers are likely to get poor performance ratings if they have few arrests, conceding that that arrest numbers are a factor in evaluating an officer's performance.[9] Ultimately, the jury in that case ruled that the police had a policy "regarding the number of arrests officers were to make that violated plaintiff's constitutional rights and contributed to her arrest."[10]

    i.    The New York City Office of Collective Bargaining concluded that officers in Brooklyn's 75th Precinct were required to issue four (4) parking tickets, three (3) moving violation citations, three (3) "quality-of-life" summonses, make one (1) arrest and two (2) stop-and-frisks each month. Arbitrator Bonnie Siber Weinstock ruled that the NYPD maintained an illegal "summons quota for traffic violations in the precinct

---

6         Tom Namako and Kirsten Fleming, *Nighttime Riders in Big Sit Fit*, The New York Post, December 26, 2009, *available at* http://www.nypost.com/p/news/local/space_hogs_lapped_on_empty_subways_m7iRAd9b4E9alYPuGvy5OO.

7         Rocco Parascandola, *Irate cops at 79th Precinct in Bedford-Stuyvesant threaten boycott over quotas*, N.Y. Daily News, Dec. 12, 2010, *available at* http://www.nydailynews.com/news/ny_crime/2010/12/12/2010-12-12_bklyn_cops_threaten_tixwriting_boycott.html#ixzz180Q0JW7t.

8         Rocco Parascandola, *Deputy Chief Michael Marino threatens cops at the 79th Precinct who want to go on summons strike*, N.Y. Daily News, Dec. 15, 2010, *available at* http://www.nydailynews.com/ny_local/2010/12/15/2010-12-15_summons_strike_i_dare_ya__deputy.html.

9         William J. Gorta, *Brooklyn Mom's Suit Targets NYPD Arrest Quotas*, N.Y. Post, Feb. 15, 2011, at 6, available on Westlaw at 2011 WLNR 2986205; see also Oren Yaniv, *Capt. Links Arrests, Evaluation of Cops*, N.Y. Daily News, Feb. 15, 2011, at 20, also available on Westlaw at 2011 WLNR 2986205.

10         Oren Yaniv, *Court rules that cops do use quotas, woman injured in 2006 arrest settles for $75,000*, N.Y. Daily News, Feb. 19, 2011, *available at* http://www.nydailynews.com/news/ny_crime/2011/02/19/2011-02-19_court_rules_that_cops_do_use_quotas_woman_injured_in_2006_arrest_settles_for_750.html.

12

and by penalizing officers for failing to meet the stated number of traffic citations." She ordered the city to cease and desist from the practice.[11]

j.  Kieran Creighton, commander of the NYPD Housing Police Service Area 8 in the northern Bronx, was investigated for ordering officers to make a certain number of arrests each month. According to The New York Daily News:

> The incident allegedly occurred in the spring when Creighton ordered at least eight members of an undercover anti-crime team to a meeting in Pelham Bay Park to berate them about an alleged lack of arrests, sources said.
>
> "You can't make the nine collars a month, then we'll all have to go our separate ways," Creighton told the officers, according to an internal complaint obtained by The News.
>
> Anything less than nine arrests would be a "personal slap in the face," Creighton allegedly said.
>
> Creighton then told the cops to "finagle" the times of arrests so any overtime was paid for by a federally funded anti-drug program, the complaint alleges.
>
> Unbeknownst to Creighton, one officer had his NYPD radio switched on - so the captain's 10 to 12 minute speech was broadcast to Bronx precincts in Morrisania and Schuylerville and taped by a 911 dispatcher.[12]

52. The existence of the aforesaid unconstitutional customs and practices, ***specifically with regard to the failure to supervise, train, instruct and discipline police officers and encouraging their misconduct***, are further evidenced, <u>inter alia</u>, by the following:

a.  The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), dated July 7, 1994, states:

> In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to collapse. It has become

---

[11]     *New York City Ticket Quota Confirmed, Denied*, The Newspaper.Com, January 21, 2006, *available at* http://www.thenewspaper.com/news/09/914.asp; *see also*, Kirsten Cole, *NYPD's Bogus Little Secret: Parking Ticket Quotas -- Agents Often Caught Citing You For Violations You Didn't Commit*; WCBSTV.com, August 14, 2007, *available at* http://wcbstv.com/topstories/parking.ticket.blitz.2.246533.html (referring to the arbitrator's report).

[12]     Allison Gendar, *NYPD captain allegedly caught in arrest quota fixing*, The New York Daily News, November 14, 2007, *available at* http://www.nydailynews.com/news/ny_crime/2007/11/14/2007-11-14_nypd_captain_allegedly_caught_in_arrest_-1.html#ixzz0bfPBhRTz.

13

more concerned about the bad publicity that corruption disclosures generate that the devastating consequences of corruption itself. As a result, its corruption control minimized, ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted – especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resources anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what the Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[13]

b. Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

c. In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in Colon v. City of New York, 09-CV-00008 (E.D.N.Y.), in which he noted a "widespread… custom or policy by the city approving illegal conduct" such as lying under oath and false swearing, Commissioner KELLY acknowledged, "When it happens, it's not for personal gain.  It's more for convenience."[14]

d. Regarding defendant City's tacit condonement and failure to supervise, discipline or provide remedial training when officers engage in excessive force, the Civilian Complaint Review Board is a City agency, allegedly independent of the NYPD, that is responsible for investigating and issuing findings on complaints of police abuse and misconduct.[15] When it does, however, Police Commissioner KELLY controls whether the NYPD pursues the matter and he alone has the authority to impose

---

[13]     Mollen Commission Report, pp. 2-3, *available at* http://www.parc.info/client_files/Special%20Reports/ 4%20-%20Mollen%20Commission%20-%20NYPD.pdf.

[14]     Oren Yaniv and John Marzulli, *Kelly Shrugs Off Judge Who Slammed Cops*, New York Daily News, December 2, 2009, *available at* http://www.nydailynews.com/news/ny_crime/2009/12/02/2009-12-02_kelly_shrugs_off_judge_who_rips_lying_cops.html.

[15]     In 2006, out of more than 10,000 allegations that were fully investigated, the CCRB substantiated only 594 (about 6%).  In 2007, out of more than 11,000 allegations that were fully investigated, the CCRB substantiated only 507 (about 5%).  *See*, CCRB Jan.-Dec. 2007 Status Report at p. 19, *available at* http://www.nyc.gov/html/ccrb/pdf/ccrbann2007_A.pdf.  Upon information and belief, the low rate of substantiated complaints is due in part to the above-noted de facto policy and/or well-settled and widespread custom and practice in the NYPD whereby officers refuse to report other officers' misconduct or tell false and/or incomplete stories, inter alia, in sworn testimony and statements given to the CCRB, to cover-up civil rights violations perpetrated by themselves or fellow officers, supervisors and/or subordinates.

discipline on the subject officer(s). Since 2005, during KELLY's tenure, only one-quarter of officers whom the CCRB found engaged in misconduct received punishment more severe than verbal "instructions." Moreover, the number of CCRB-substantiated cases that the NYPD has simply dropped (i.e., closed without action or discipline) has spiked from less than 4% each year between 2002 and 2006, to 35% in 2007, and approximately 30% in 2008. Alarmingly, the NYPD has refused to prosecute 40% of the cases sent to it by the CCRB in 2009.[16] As a result, the percentage of cases where the CCRB found misconduct but where the subject officers were given only verbal instructions or the matter was simply dropped by the NYPD rose to 66% in 2007. Substantiated complaints of excessive force against civilians accounted for more than 10% of the cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.[17]

53. The existence of the aforesaid unconstitutional customs and practices, ***specifically with regard to the practice or custom of discouraging police officers from reporting the corrupt or unlawful practices of other police officers and of retaliating against officers who report misconduct***, are further evidenced, <u>inter alia</u>, by the following:

   a. Former New York County District Attorney Robert Morgenthau has been quoted as acknowledging that, in the NYPD, there is a "code of silence," or a "code of protection" that exists among officers and that is followed carefully;

   b. In 1985, former NYPD Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the "code of silence" in the NYPD;

   c. Former NYPD Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence, is reinforced every day in every way."

54. The existence of the above-described unlawful <u>de facto</u> policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officer and officials of the NYPD and the City, including, without limitation, Commissioner Raymond Kelly.

---

[16]    Christine Hauser, *Few Results for Reports of Police Misconduct*, New York Times, October 5, 2009, at A19.

[17]    Daily News, *Editorial: City Leaders Must Get Serious About Policing the Police*, August 20, 2008.

55. All of the foregoing acts by defendants deprived Mr. Pariante of federally protected rights, including, but limited to, the constitutional rights enumerated in paragraph "44" above.

56. Defendant City knew or should have known that the acts alleged herein would deprive Mr. Pariante of his rights, in violation of the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

57. Defendant City is directly liable and responsible for the acts of the officer-defendants because it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulation of the City and NYPD, and to require compliance with the Constitution and laws of the United States.

58. Despite knowledge of such unlawful <u>de facto</u> policies, practices and/or customs, these supervisory and policy-making officers and officials of the NYPD and the City, including Commissioner KELLY, have not taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanction and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of said policies, practices and/or customs upon the constitutional rights of persons in the City of New York.

59. The aforementioned City policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein. Specifically, pursuant to the aforementioned City policies, practices and/or customs, the officer-defendants felt empowered to arrest Mr. Pariante

without probable cause, knowing he possessed Tramadol, which any reasonably competent officer would know is not a "controlled substance" under New York law.

60. Mr. Pariante's injuries were a direct and proximate result of the defendant City and the NYPD's wrongful de facto policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the defendant City and the NYPD to properly supervise, train and discipline their police officers, particularly its narcotics officers.

**THIRD CLAIM**
***RESPONDEAT SUPERIOR* LIABILITY OF THE City OF NEW YORK**
**FOR VIOLATIONS OF THE LAWS OF THE STATE OF NEW YORK**

61. Mr. Pariante incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

62. The conduct of the officer-defendants alleged herein occurred while they were on duty and in uniform, and/or in and during the course and scope of their duties and functions as NYPD officers, and/or while they were acting as an agent and employee of defendant City, clothed with and/or invoking state power and/or authority, and, as a result, defendant City is liable to Mr. Pariante pursuant to the state common law doctrine of *respondeat superior*.

63. As a result of the foregoing, Mr. Pariante was deprived of his liberty, suffered specific bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

**FOURTH CLAIM**
**ASSAULT AND BATTERY**
**UNDER THE LAWS OF THE STATE OF NEW YORK**

64. Mr. Pariante incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

65. By the actions described above, defendants did inflict assault and battery upon Mr. Pariante. The acts and conduct of defendants were the direct and proximate cause of injury and damage to Mr. Pariante and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

66. As a result of the foregoing, Mr. Pariante was deprived of his liberty, suffered specific bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

### FIFTH CLAIM
### FALSE ARREST AND FALSE IMPRISONMENT
### UNDER THE LAWS OF THE STATE OF NEW YORK

67. Mr. Pariante incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

68. By the actions described above, defendants caused to be falsely arrested or falsely arrested Mr. Pariante, without reasonable or probable cause, illegally and without a warrant, and without any right or authority to do so. The acts and conduct of the defendants were the direct and proximate cause of injury and damage to Mr. Pariante and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

69. As a result of the foregoing, Mr. Pariante was deprived of his liberty, suffered specific bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

### SIXTH CLAIM
### ABUSE OF PROCESS
### UNDER THE LAWS OF THE STATE OF NEW YORK

70. Mr. Pariante incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

71. By the conduct and actions described above, defendants employed regularly issued process against Mr. Pariante compelling the performance or forbearance of prescribed acts. The purpose of activating the process was intent to harm Mr. Pariante without economic or social excuse or justification, and the defendants were seeking a collateral advantage or corresponding detriment to Mr. Pariante (namely, the attainment of the officer-defendants' arrest quotas or so-called productivity goals), which was outside the legitimate ends of the process. The acts and conduct of the defendants were the direct and proximate cause of injury and damage to Mr. Pariante and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

72. As a result of the foregoing, Mr. Pariante was deprived of his liberty, suffered specific bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

**SEVENTH CLAIM**
**INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
**UNDER THE LAWS OF THE STATE OF NEW YORK**

73. Mr. Pariante incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

74. By the actions described above, defendants engaged in extreme and outrageous conduct, which intentionally and/or negligently caused severe emotional distress to Mr. Pariante. The acts and conduct of the defendants were the direct and proximate cause of injury and damage to Mr. Pariante and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

75. As a result of the foregoing, Mr. Pariante was deprived of his liberty, suffered specific bodily injury, pain and suffering, psychological and emotional injury, great humiliation, costs and expenses, and was otherwise damaged and injured.

## EIGHTH CLAIM
## NEGLIGENCE
## UNDER THE LAWS OF THE STATE OF NEW YORK

76. Mr. Pariante incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

77. The defendants, jointly and severally, negligently caused injuries, emotional distress and damage to Mr. Pariante. The acts and conduct of the defendants were the direct and proximate cause of injury and damage to Mr. Pariante and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

78. As a result of the foregoing, Mr. Pariante was deprived of their liberty, suffered specific bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## NINTH CLAIM
## NEGLIGENT HIRING, SCREENING, RETENTION, SUPERVISION, AND TRAINING
## UNDER THE LAWS OF THE STATE OF NEW YORK

79. Mr. Pariante incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

80. Defendant City negligently hired, screened, retained, supervised, and trained Sgt. Vargas and Det. Bocachica. The acts and conduct of the defendants were the direct and proximate cause of injury and damage to Mr. Pariante and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

81. As a result of the foregoing, Mr. Pariante was deprived of his liberty, suffered specific bodily injury, pain and suffering, psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

**TENTH CLAIM**
**MALICIOUS PROSECUTION**
**UNDER THE LAWS OF THE STATE OF NEW YORK**

82. Mr. Pariante incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

83. By the actions described above, by the false allegations against Mr. Pariante in the accusatory instrument and the incompetence or knowing bad faith of the officer-defendants in arresting Mr. Pariante for possession of Tramadol, the officer-defendants caused a criminal proceeding to be initiated against Mr. Pariante, even though there was no probable cause for an arrest or prosecution in this matter. The officer-defendants maliciously caused this prosecution to be initiated in that they knew there was no probable cause for such prosecution and that they further wished to harm and punish Mr. Pariante for illegitimate reasons. The criminal case against Mr. Pariante was terminated in his favor in that the criminal court judge dismissed the sole charge against him at the first court appearance.

84. As a result of the foregoing, Mr. Pariante was deprived of his liberty, suffered specific bodily injury, pain and suffering, psychological and emotional injury, great humiliation, costs and expenses, and was otherwise damaged and injured.

**JURY DEMAND**

85. Mr. Pariante demands a trial by jury in this action on each and every one of his damage claims.

**WHEREFORE**, Mr. Pariante demands judgment against the defendants individually and jointly and prays for relief as follows:

a.  That he be compensated for violation of his constitutional rights, pain, suffering, mental anguish, and humiliation; and

b.  That he be awarded punitive damages against the officer-defendants; and

c.  That he be compensated for attorneys' fees and the costs and disbursements of this action; and

d.  For such other further and different relief as to the Court may seem just and proper.

Dated:   New York, New York
     September 26, 2012

Respectfully submitted,

/s/

By: _____
   Robert M. Quackenbush
   Rankin & Taylor, PLLC
   *Attorneys for the Plaintiff*
   350 Broadway, Suite 701
   New York, New York 10013
   t: 212-226-4507